UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DARNELL DOSS, | ) | CIVIL ACTION NO. 4:19-CV-1789 |
| Plaintiff | ) | |
| | ) | (RAMBO, D.J.) |
| v. | ) | |
| | ) | (ARBUCKLE, M.J.) |
| BUREAU OF PRISONS, *et al.,* | ) | |
| Defendants | ) | |

<u>REPORT & RECOMMENDATION</u>
*Moving Defendants Motion to Dismiss/For Summary Judgment, (Doc. 25)*

## I.   INTRODUCTION

Federal inmate Darnell Doss ("Plaintiff") claims that numerous BOP employees[1] sought to prevent him from practicing his religion.  His fifty-one (51) page complaint cover numerous incidents over a span of two years at two different federal prisons.  His description of exactly what his religion is varies within the complaint, but in the caption, he types "Darnell Doss, Hebrew Israelite Nazarene" as the Plaintiff.

This complaint, about religious discrimination in federal prison, although typewritten, is difficult to interpret. In describing what he asked for to practice his religion and what was denied Plaintiff uses words that have different

---

[1] Twenty-six defendants (19 named employees, 6 John/Jane Does and the BOP).

meanings in different religions and does not define them.[2]  Additionally, on just one page of the complaint, he uses a variety of words and phrases to describe his religion.[3]  That said, the gist of his complaint is that his religion is practiced by black inmates but white inmates practicing similar religions are given preferential treatment.  He claims that his attempts to rectify this discrimination were met with frustration and retaliation. Despite these difficulties we interpret his complaint in the light most favorable to him and proceed assuming at this stage that his stated religious beliefs and requirements are sincerely held if somewhat unclear.

Plaintiff alleges that, between 2018 and 2019 BOP employees at FCI Allenwood and FCI McKean interfered with his ability to practice his religion while incarcerated by denying and/or delaying the resolution of many of Plaintiff's requests for accommodations. Plaintiff asserts *Bivens* claims under the First and Fifth Amendments, claims under the Religious Freedom Restoration Act ("RFRA"), and claims under 42 U.S.C. §§ 1981, 1985, and 1986.

---

[2] Examples include: Yahrzeit candles; challa; callam bread; shofar; tiffin [probably tefillin]; kiddush; succah and sukkot; manorah [probably menorah]; and mottza [probably matzo or matzoh].

[3] Doc. 1, Part B. ¶1, p. 4 [section on Baptism] lists "Hebrew Israelite Nazarene (Black) Messianic faith banner" inmates; "Hebrew Israelite, Nazarene/Messianic banner" inmates; "Messianic banner" inmates; "Hebrew Israelite, Nazarene Messianic Banner" inmates; and "Hebrew Israelites."

The seventeen names and served Defendants collectively have filed a Motion seeking dismissal, or in the alternative summary judgment, as to all of Plaintiff's claims. (Doc. 25). Since that Motion was filed, the Court has advised Plaintiff of his obligations to respond, granted Plaintiff several extensions of time, and has even (unsuccessfully) attempted to find volunteer counsel to represent Plaintiff. To date, Plaintiff has not filed a response to the pending Motion.

For the reasons explained below, it is RECOMMENDED that:

(1)     Plaintiff's entire Complaint be DISMISSED pursuant to Fed. R. Civ. P. 41(b), for the failure to abide by Court orders; or if the Court concludes that Plaintiff has not abandoned this case**, in the alternative**,

(2)     Moving Defendants' Motion to Dismiss/Motion for Summary Judgment (Doc. 25) be GRANTED in PART to the extent it is consistent with this REPORT.

Pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and Moving Defendants' Motion to Dismiss/Motion for Summary Judgment (Doc. 25), dismissal/judgment should be GRANTED as to all claims EXCEPT Plaintiff's RFRA claims related to the symbols in the Allenwood Chapel, his request to wear a purple head covering, and his objection to the PPD type Tuberculosis test.

## II.      BACKGROUND & PROCEDURAL HISTORY

### A.     PROCEDURAL HISTORY

On October 17, 2019, federal inmate Darnell Doss ("Plaintiff") lodged the Complaint in this case. In that Complaint, Plaintiff listed the following 26 Defendants (nineteen named Defendants, and 7 entries for "John Doe" Defendants):

(1)   Bureau of Prisons;

(2)   Chaplain Cusiluwsky (correctly spelled Cieslukowki) of Allenwood FCI;

(3)   Chaplain Moore of Allenwood FCI;

(4)   Chaplain Kim of Allenwood FCI;

(5)   Chaplain Glogau of FCI McKean;

(6)   Unit Manager Nicholas (Unit 2-A) of Allenwood FCI;

(7)   Counselor Seagraves (correctly spelled Segraves) (Unit 2-A) of Allenwood FCI;

(8)   Warden Spartan (correctly identified as Spaulding) of Allenwood FCI;

(9)   Warden Lane of Allenwood FCI;

(10)   AW Washington, AW of Programs of Allenwood FCI;

(11)   Officer Brown Administrative Remedy Coordinator Allenwood Penn;

(12)   Jane Doe 1, Administrative Remedies Clerk & Assistant Warden of Program's Secretary;

(13)   SIS Lieutenant Ready (correctly spelled Reedy) of Allenwood FCI;

(14)   SIS Lieutenant Pretezer of Allenwood FCI;

(15)   SIS Lieutenant Kane (correctly spelled Cain) of Allenwood FCI;

(16)   Lieutenant O'Connor of Allenwood FCI;

(17)   Lieutenant Munchler (correctly spelled Mutchler) of Allenwood FCI;

(18)   John Doe 2, Lieutenant of Allenwood FCI (Name Unknown);

(19)   John Doe 3, Lieutenant of Allenwood FCI (Name Unknown);

(20)   John Doe 4, Lieutenant of Allenwood FCI;

(21)   D. Wolover (correctly spelled Wolever), Property Officer of Allenwood FCI;

(22)   John Doe 5, Property Officer of Allenwood FCI;

(23)   John Doe 6, Mail Room Officer of Allenwood FCI;

(24)   Six Unknown Correction Officers of Allenwood FCI;

(25)   Medical Staff Ms. Wright of FCI McKean; and

(26)   Medical Staff ASP of FCI McKean.

(Doc. 1, p. 1).[4] On October 25, 2019, Plaintiff filed a Motion seeking leave to proceed *in forma pauperis*. (Doc. 6). On October 30, 2019, the Court granted leave to proceed *in forma pauperis*, deemed Plaintiff's Complaint filed, and directed the Clerk of Court to serve all Defendants. (Doc. 9).

Due to a clerical error in the Clerk's office, no waiver was sent to Defendant Asp. The Complaint list "Medical Staff Asp of FCI McKean as Defendant #26. However, Defendant Asp is not listed on the docket, has not been served, and the government has not responded on Asp's behalf.  The Court discovered this error during its analysis of the Motion to Dismiss.

After being granted an extension of time to respond, fourteen Defendants returned a waiver of service (Cusiluwsky, Moore, Kim, Glogau, Nicholas, Seagraves, Lane, Washington, Brown, Ready, Kane, Munchler, Wolover, and Wright). (Doc. 14). Defendant Pretezer did not return a waiver of service, but did file a response to the Complaint. No proof of service was docketed as to the Federal Bureau of Prisons, but it also filed a response to the Complaint. Defendants Bureau of Prison and Pretezer do not appear to dispute that they have been properly served.

---

[4] It appears that several Defendants' names were misspelled by Plaintiff in the Complaint. Corrected spellings were identified in the waivers of service. The corrected spelling of each name is identified in parenthesis on the list above. To avoid unnecessary confusion, however, I have referred to each Defendant by the name used by Plaintiff in the Complaint.

Two Defendants—Warden Spartan and Lt. O'Connor—could not be located at FCI Allenwood. (Doc. 15). On January 8, 2020, Plaintiff was asked to provide the correct name or address for these two Defendants. (Doc. 16). The named Defendant identified as "Warden Stephen Spartan" was later identified as "Warden Spaulding." (Doc. 23). On March 17, 2020, Defendant Spaulding waived service. (Doc. 22). The Defendant identified as "Lieutenant O'Connor" has not been identified and has been treated as a "John Doe" Defendant. (Doc. 24, p. 4).

On May 18, 2020, the Seventeen named and served Defendants (Bureau of Prisons, Brown, Cusiluwsky, Glogau, Kane, Kim, Lane, Moore, Munchler, Nicholas, Pretezer, Ready, Seagraves, Spaulding, Washington, Wolover, and Wright - collectively "Moving Defendants") filed a Motion seeking dismissal or in the alternative summary judgment. (Doc. 25). On June 1, 2020, Moving Defendants filed a Brief in Support (Doc. 26), Statement of Facts (Doc. 27), and Exhibits (Doc. 27-1).

The government's response[5] generally alleges that Plaintiff's complaint, as written, fails to state any claim upon which relief can be granted.

_____

[5] The Motion (Doc. 25) is captioned "Motion to Dismiss and/or for Summary Judgment."  The Motion is accompanied by two proposed orders, one ordering dismissal for failure to state a claim, and one granting summary judgment.  The government then filed a Brief (Doc. 26) captioned "Brief in Support of Defendants' Motion to Dismiss and/or Motion for Summary Judgment."  The Government also filed a Statement of Facts (Doc. 27) consisting of sixteen (16) pages and ninety-one (91) numbered paragraphs.  Attached to that statement of facts was an exhibit (Doc.

On June 3, 2020, the Court issued an Order directing Plaintiff to respond to Moving Defendants' Motion and advised him of the consequences of failing to respond. (Doc. 28).

On June 15, 2020, Plaintiff sought an extension of time to respond. (Doc. 29). On June 19, 2020, Plaintiff's request for more time was granted. (Doc. 30).

On August 14, 2020, Plaintiff sought an extension of time to respond. (Doc. 32). On August 21, 2020, Plaintiff's request for more time was granted. (Doc. 33).

On October 20, 2020, Plaintiff sought an extension of time to respond. (Doc. 34). On November 18, 2020, Plaintiff's request was granted. (Doc. 35).

On January 21, 2021, Plaintiff sought an extension of time to respond and requested the appointment of counsel. (Doc. 38). On March 4, 2021, Plaintiff's request for counsel was conditionally granted and the case was stayed for sixty days while the Pro Bono Committee attempted to find counsel to represent Plaintiff. (Doc. 39). On May 4, 2021, the Pro Bono Chair informed the Court that he could not locate a willing volunteer attorney or law firm to represent Plaintiff. (Doc. 40).

---

27-1) consisting of 152 pages, but no index or table of contents. The Exhibit consists of Affidavits from thirteen (13) staff members, each denying the allegations against them in the complaint, often with explanations and documents attached. Taken together, if believed as true, they refute most of the factual claims made in Doss's complaint.

On June 10, 2021, the Court lifted the stay, issued an order directing Plaintiff to respond to Moving Defendants' Motion on or before July 12, 2021, and advised Plaintiff of the consequences of failing to respond. (Doc. 42). To date, the Court has not received a response to Moving Defendants' Motion.

### B. ALLEGATIONS IN PLAINTIFF'S COMPLAINT

The substantive claims alleged by Plaintiff in his Complaint are laid out of 5 sections (A through E). Section A of the Complaint outlines the causes of action Plaintiff is attempting to allege. (Doc. 1, p. 3). Section B outlines Plaintiff's RFRA claims. (Doc. 1, pp. 4-22). Section C outlines Plaintiff's claims of "racial and religious discrimination," which I construe as his Fifth Amendment claims. (Doc. 1, pp. 22-27). Section D outlines Plaintiff's retaliation claims, which I construe as his First Amendment claims. (Doc. 1, pp. 27-30). Section E, in large part, outlines Plaintiff's "civil conspiracy" claims, which I construe as Plaintiff's claims under 42 U.S.C. §§ 1981, 1985, and 1986. (Doc. 1, pp. 30-49). Section E also appears to assert an additional retaliation claim relating to an institutional transfer from FCI Allenwood to FCI McKean.

With respect to his legal claims outlined in "Part A" of his Complaint, Plaintiff alleges that:

> Beginning on and/or about May of 2017, and continuing up until and/or about January of 2018, all named Defendant and unknown Defendants

whom at this time are unnamed, have acted individually and/or in confederate agreement and/or in concert agreement, either directly and/or constructively in furtherance of a multi-faceted civil conspiracy in violation of 42 U.S.C. § 1985 and 1986 for the purpose of depriving Plaintiff, individually/personally and/or collectively as a representative and member of the Nazarene (Branches) Hebrew Israelite's B.O.P. recognized Messianic Religious Banner faith group, of Equal Protection of the Law in violation of Federal Law 42 U.S.C. § 1981 as well as the Due Process Clause and Equal Protection of the Law protected by the 5th and 14th amendments to the Constitution for the United States. A statement of some of the laws, rights and freedoms purposely deprived are as follows:

1. Religious Freedom Restoration Act (RFRA) of 1993 42 U.S.C. § 2000bb deprivations;

   A) Freedom to exercise practices and beliefs in Plaintiff's religion.

2. United States Constitutional 1st Amendment deprivations;

   A) Freedom of Speech.

   B) Right to Redress Grievances.

3. United States Constitutional 5th amendment deprivations;

   A) Freedom from discrimination on the base of race and religion.

   B) Freedom from retaliation for exercise of 1st amendment constitutional Right to Freedom of Speech and Right to Redress Grievances.

   C) Freedom from Arbitrary Government Action.

   D) Right to Due Process and Equal Protection of the Law.

4. United States Constitutional 8th amendment deprivations;

A)      Cruel and Unusual Punishment.

(Doc. 1, p. 3). I will discuss the supporting factual allegations for each claim in more detail in my analysis—with two exceptions. Although Plaintiff mentions the Eighth and Fourteenth Amendments in "Part A" of his Complaint, nothing in Parts B through E includes any allegations as to the nature of these claims. As such, to the extent any such claim is alleged, it should be dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) [IFP Plaintiff fails to state a claim upon which relief may be granted.].

Part F of Plaintiff's Complaint contains sixteen (16) detailed requests for relief and a claim for money damages. As relief, Plaintiff requests for himself and all other Messianic Banner Inmates:

1. Baptism/Feast of Week, Permanent Injunction requiring (A) authorization of all Messianic Banner inmates to conduct and perform baptism upon each other as needed for new believers, to teach each new believer how to perform baptism when needed to be. (B) A Baptism Feast of Weeks New Covenant Memorial Service every year for all Messianic groups. (C) Service time for baptism service to include prayer time and Kiddush Callah bread and grape juice, incense (2), candles (2).

2. New Moon, Permanent Injunction requiring authorization of New Moon Service time every month for all Messianic Banner inmates through out the BOP (3 hours), Callah bread, grape juice, incense (2), candles (2), Shofar, Hot Kosher Lamb tray to be eaten in chapel with Kiddush for New Moon Celebration.

3. Feast of Trumpets, Permanent Injunction requiring authorization of all Messianic inmates through out the BOP provisions of 2 loaves of Callah bread, 2 portions of grape juice boxes, 2 large fresh apples per

night of the Feast of Trumpets, 1 jar of honey for both nights together, 1 pint of whole milk per night. A large Shofar, 2 candles, 2 incense, High Holy Day Messianic and Hebrew Israelite (Messianic) Nazarene Prayer Book in both Hebrew and English. 3 hour service time per night of Feast of Trumpets. Work prescription for first 2 days, authorization for ritual self immersion the day before Feast of Trumpets.

4.    <u>Day of Atonement</u>/Yom Kippur, Permanent Injunction prequring authorization of all Messianic inmates through out the BOP provision of (A) Work prescription; (B) Substantial pre-fast and post-fast meal consisting of 500 additional calories to the 2500 calories mandated for FBOP inmates daily; (C) Callah bread and grape juice for Kiddush pre-fast and post-fast meal authorized to be eaten in the chapel during (D) Pre-fast and post-fast service time; (E) Chapel service time through out the Day of fast with Yahrzeit candles of mourning, myrth incense, Shofar, High holy Day Hebrew Israelite and Messianic Prayer book.

5. <u>Feast of Tabernacle/Booths/Succot</u>, Permanent Injunction requiring (A) Messianic Banner inmates to be provided their own Booth/Succah tent separate from other religious groups; (B) provided a succah that fits all participants for prayer, service and eating; (C) Callah bread, grape juice, Mottza, honey, and olive oil; (D) the 4 species Etrog Lulav Myrtle and willow with access to them and the succah every day of feast of Tabernacles; (E) work prescription for first 2 days and last 2 days with all-day access to Succah for a service and prayer worship study and service on those days; (F) Access to Succah for a service and prayer time every day for all Messianic banner inmates through out the BOP.

6. <u>Feast of Dedication/Khanaka</u>, Permanent Injunction requiring (A) Messianic banner inmates to be provided a Manorah [sic] with 7 candel [sic] holders per participant; (B) two loaves of Callah bread for 8 days; (C) fresh palm branches; (D) stick and ivy leaves with authorization to decorate our worship area symbolized as our temple rededication; (E) incense censor with charcoal pad and rock frankensence [sic] incense; (F) honey, Fruits of Israel; (G) a lighter that uses flint strike; (H) service time every day with grape juice for Kiddush with Callah and Mottaz [sic]; (I) opportunity for baptism service; (J) prayer rugs.

7. <u>Sabbath Observance</u>, Permanent Injunction requiring Messianic banner inmates to be provided (A) service time Friday night after sunset for 2 hours without count for summer more sunlight time of the year. Saturday morning, afternoon and close of Sabbath Saturday night Hadavallah service for 2 hours each with authorization to eat meals; (B) No travel Sabbath provisions for Sabbath meal (1 hot on Friday night served up to the chapel for eating with Kiddush, all cold meals be put in bags for Saturday breakfast with lunch and dinner to be picked up on the preparation day Friday afternoon); (C) No pagan symbol service area to keep Sabbath in; (D) either rock frankincense with charcoal pad and sencers [sic] or 2 frenkincense that last for the two hours of service; (E) wash basin and pitcher made of clay Shofar; (F) table cloth for alter table; (G) hand towels; (H) 2 two hour white service candles; (I) special spices candles with several wicks for Hadalvah service; (J) Torrah in ancient Hebrew, Modern Hebrew and English; (K) New Testament and Old Testament and Book of Prophet in Hebrew and English; (L) Book of Enoch and Jubbillies scriptures, Kiddush cup (if plastic cup unopened only); (M) prayer shawl with Tizit Messianic Root symbols (white, purpose and gold); (N) authorize to wear prayer shawls on Sabbath and preparation day as well as holidays and appointed times through out the prison complex, folded as a regular commissary scarf draped over back of neck and hanging over the shoulders and chest; (O) prayer rugs for services and authorization to buy them.

This is all provided to all Messianic banner inmates through out the BOP.

8. <u>Head Covering</u>, Permanent Injunction requiring all Messianic banner inmates to be authorized to wear head covering with Messianic Root symbol as long as they present no threat to the safety and security of the institution or its orderly running and is strictly religious in nature. I specifically request relief in the form of the return of my Messianic Hebrew Israelite Nazarene head covering that was taken that has specific sentimental value, is specifically religious and present no threat to the institution and a permanent injunction to keep and wear through out the BOP at all times. As well as authorization for specific Hebrew writing on head coverings, the name of Yahawah in either ancient or modern Hebrew and the ancient or modern Hebrew symbol for Yahshua the first and last letter of the Hebrew alphabet for all Messianic banner inmates through out the BOP.

9. <u>Daily Prayer</u>, Permanent Injunction requiring all Messianic banner inmates to be authorized 3 daily prayer hours for community prayer in chapel through out the BOP.

10. <u>Passover</u>, Permanent Injunction requiring all Messianic banner inmates to receive whole lamb roasted for Passover, at the very minimum a roasted leg of lamb for Sidur plates without broken bone, fresh cooked portato, celery, romaine lettuce, grape juice and Mottza. The ceremonial platter 1 egg lamb shank unbroken bone, charosis, thick mixture of apples walnuts grape juice cinnamon bitter herbs and horseradish. Kosher knife, cutting board, blender and sealable pressure pot with authorization to prepare fresh all Passover food, all appliances and untensils [sic] to be kept in a kosher section of the kitchen. Service time and out count for Passover observance. Hessianic Haggadah candles, incense for all Messianic inmates thoughout the BOP.

11. <u>Purim</u>. Permanent Injunction that provides all Messianic inmates receive a ceremonial meal on Purim with the chance to pick off menu for ceremonial meal and have service time in chapel to pray with Callah bread and Kiddush in all BOP facilities for Messianic faith banner inmates.

12. <u>No TB Injection Testing</u>, Permanent Injunction for all Messianic banner inmates mandating the BOP to test for TB by the least restrictive means of either spital or chest x-ray to accomplish the penological goal for any and all religiously conscious objector of being injected with defiling TB test hold the sincerely held belief that their body is a temple of the Most High. For all Messianic banner inmates throughout the BOP.

13. <u>Religious Authority Validation for all Religious Practice of Messianic Banner Inmates</u>, Permanent Injunction requiring all BOP chaplains and staff to recognize all scripturally demonstrated practices as valid, those scripture include Old and New Testament, Torah, Book of Enoch and Jubbillies and Dead Sea Scrolls. Establishment of policy that any inmate claiming any religious practice in these scriptures, especially Hebrew Israelite, are to be authorized unless safety and security of the institution would be effected which must be set forth in writing with opportunity to be challenged if the reason is not reasonably

demonstrated to be a threat of some sort for all Messianic inmates throughout the BOP.

14. <u>New Grievance Procedure and Process</u>, mandating logs of (A) when inmate turned in a grievance, signed by the officer receiving it; (B) when inmate is returned the grievance document with verification of providing of necessary documents to appeal where 20 day run date starts from that log date; (C) a grievance box located in the chow hall so inmates do not have to deal with Unit Team to make a grievance; (D) stocking of grievance forms in the law library accessible with Staff 8, 9, 10, and 11 BP forms; (E) appointment of a grievance officer who is not a staff member of the facility, a neutral party to assist in Informal Resolutions who conduct interviews and investigations of inmates' claims, unbiasly holding staff accountable when necessary; (F) notice of staff discipline and statement of merit to an inmate complaint from grievance officer so a sense of justice and finality can be had when filing a grievance; (G) provisions that comply with inmate mail box rule once inmate provides to the institution staff all administrative remedies are considered filed; (H) Inmate Electronic Requests feature for grievance officer, directly accessible to contact as all other administrators.

15. <u>No Retalatory [sic] Actions</u>, Permanent Injunction requiring all BOP staff to cease and decist all retaliatory tactics such as transfer, harrassment, excessive pat downs, cell searches, abuses of discretion, deliberate indifference to merited complaints ext al [sic] other unspecified actions that would infer subtle or out right retaliatory action without limitation for exercise of Plaintiff's first amendment right to file civil suit and/or exhaust administrative remedies necessary to redress grievances with the court.

16. <u>New Transfer Procedures</u>, Permanent Injunction requiring the BOP to create new transfer procedures providing checks and balances. To include specific questions regarding if an inmate has filed suit and/or administrative remedies approximate to the time period prior to transfer. If so, whas [sic] the inmate given the opportunity to exhaust those remedies prior to transfer to resolve issues and stay of transfers until the outcome of matters unless specifically waived by inmates. And any other procedures deemed appropriate.

Monetary Damages

I seek compensatory damages in the amount of $250,000.00 per violation of my religious rights under RFRA § 2000bb.

I seek compensatory damages in the amount of $250,000.00 per violation of my First Amendment right to Freedom of Speech.

I seek compensatory damages in the amount of $250,000.00 per violation of my Fifth Amendment right to Freedom from discrimination of the base of race and religion. Freedome [sic] from retaliation for exercise of First Amendment right to First Amendment constitutional right to Freedom of Speech and right to Redress Grievance. Freedom from Arbitrary Government Act. And right to Due Process and Equal Protection of the law.

I seek compensatory damages in the amount of $250,000.00 per violation of my Eighth Amendment right to freedom from Cruel and Unusual Punishment.

I seek punitive damages in the amount of $1,000,000.00 per intentional deliberate indifference and/or act in violation of the First Amendment right to Freedom of Speech; RFRA § 2000bb Religious Rights; Fifth Amendment right to freedom from discrimination on the base of reace [sic] and religion, retaliation for exercise of First Amendment rights of Free Speech and t Redress Grievances, Arbitrary Government Action, and right to Due Process and Equal Protection of the law.

I seek all monetary damages against all Defendants jointly and severally for all conduct described herein found to violate Plaintiff's constitutional rights and religious freedoms.

I seek trial by jury of my peers to be set on all above claims wherein to allow the jury to determine the constitutional violations, religious violations and the amount of money damages warranted for the invasions of Plaintiff's liberties.

(Doc. 1, pp. 49-55) (typographical errors in original).

## C. THE DEFENDANT'S RESPONSE TO PLAINTIFF'S COMPLAINT

In their Brief (Doc. 26) the Government sets forth eight general arguments and concludes that "the Court should "dismiss Doss' complaint and grant summary judgment in Defendants' favor." (Doc. 26 at p. 25). The government in its Brief raises these eight specific arguments:

1)    Doss Failed to State a Fifth or Eighth Amendment Claim.

2)    The BOP should be dismissed with prejudice from Doss's lawsuit.

3)    Venue is not proper in the Middle District of Pennsylvania for the claims against Glogau and Wright.

4)    Doss does not have an available Bivens-remedy First Amendment retaliation claim.

5)    Doss does not state a RFRA claim because he did not suffer a substantial burden on the exercise of his religion.

6)    As a United States Public Health Service Officer, Defendant Medical Staff Wright has statutory immunity.

7)    Defendants Lack Personal Involvement.

8)    Respondeat Superior cannot form the basis of a Bivens claim.

These arguments do not follow the complaint but speak generally to legal concepts applicable in prisoner cases.  I have chosen to analyze the request for dismissal or summary judgment following the Plaintiff's complaint.   Where

necessary I will address a unique argument[6] raised in the Defendant's Brief when it concerns a specific portion of the complaint.  To do this I must first address the legal standards necessary to decide the Government's motion.

## III.   LEGAL STANDARDS

### A.   MOTION TO DISMISS

A motion to dismiss tests the legal sufficiency of a complaint. It is proper for the court to dismiss a complaint in accordance with Rule 12(b)(6) of the Federal Rules of Civil Procedure only if the complaint fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). When reviewing a motion to dismiss, the court "must accept all factual allegations in the complaint as true, construe the complaint in the light most favorable to the plaintiff, and ultimately determine whether Plaintiff may be entitled to relief under any reasonable reading of the complaint." *Mayer v. Belichick*, 605 F.3d 223, 229 (3d Cir. 2010). In review of a motion to dismiss, a court must "consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the [plaintiff's] claims are based upon these documents." *Id.* at 230.

In deciding whether a complaint fails to state a claim upon which relief can be granted, the court is required to accept as true all factual allegations in the

---

[6] Specifically: Argument 3 Venue; and Argument 8 Public Health Officer Immunity.

complaint as well as all reasonable inferences that can be drawn from the complaint. *Jordan v. Fox Rothchild, O'Brien & Frankel, Inc.*, 20 F.3d 1250, 1261 (3d Cir. 1994). These allegations and inferences are to be construed in the light most favorable to the plaintiff. *Id.* The court, however, "need not credit a complaint's bald assertions or legal conclusions when deciding a motion to dismiss." *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997). Further, it is not proper to "assume that the [plaintiff] can prove facts that [he] has not alleged." *Associated Gen. Contractors of Cal. v. California State Council of Carpenters*, 459 U.S. 519, 526 (1983).

"A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Rather, a complaint must recite factual allegations sufficient to raise the plaintiff's claimed right to relief beyond the level of mere speculation. *Id.* To determine the sufficiency of a complaint under the pleading regime established by the Supreme Court, the court must engage in a three-step analysis:

> First, the court must take note of the elements a plaintiff must plead to state a claim. Second, the court should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth. Finally, where they are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief.

*Santiago v. Warminister Twp.*, 629 F.3d 121, 130 (3d Cir. 2010) (quoting *Iqbal*, 556 U.S. at 675, 679). "In other words, a complaint must do more than allege the

plaintiff's entitlement to relief" and instead must "'show' such an entitlement with its facts." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009).

> As the Court of Appeals has observed:

> The Supreme Court in *Twombly* set forth the "plausibility" standard for overcoming a motion to dismiss and refined this approach in Iqbal. The plausibility standard requires the complaint to allege "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570, 127 S.Ct. 1955. A complaint satisfies the plausibility standard when the factual pleadings "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S.Ct. at 1949 (citing *Twombly*, 550 U.S. at 556, 127 S.Ct. 1955). This standard requires showing "more than a sheer possibility that a defendant has acted unlawfully." *Id.* A complaint which pleads facts "merely consistent with" a defendant's liability, "stops short of the line between possibility and plausibility of 'entitlement of relief.'" *Id.* (citing *Twombly*, 550 U.S. at 557, 127 S.Ct. 1955).

*Burtch v. Millberg Factors, Inc.*, 662 F.3d 212, 220-21 (3d Cir. 2011).

### B.   MOTION FOR SUMMARY JUDGMENT

We will examine the motion for summary judgment under a well-established standard. Rule 56(a) of the Federal Rules of Civil Procedure provides as follows:

> A party may move for summary judgment, identifying each claim or defense - or the part of each claim or defense - on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

Fed. R. Civ. P. 56(a). For purposes of Rule 56, a fact is material if proof of its existence or nonexistence might affect the outcome of the suit under the applicable

substantive law. *Haybarger v. Laurence Cnty. Adult Prob. & Parole*, 667 F.3d 408, 412 (3d Cir. 2012) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). For an issue to be genuine, "all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Id.* (quoting *Anderson,* 477 U.S. at 248-49).

In adjudicating a summary judgment motion, the court must view the evidence presented in the light most favorable to the opposing party, *Anderson*, 477 U.S. at 255, and draw all reasonable inferences in the light most favorable to the non-moving party, *Big Apple BMW, Inc. v. BMW of North America, Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992). When the non-moving party's evidence contradicts that advanced by the movant, then the non-movant's must be taken as true. *Big Apple BMW*, 974 F.2d at 1363.

Accordingly, the moving party must show that if the evidence of record were reduced to admissible evidence in court, it would be insufficient to allow the non-moving party to carry its burden of proof. *See Celotex v. Catrett*, 477 U.S. 317, 323 (1986). The parties must rely on admissible evidence when meeting their burdens for summary judgment, but their evidence only needs to be admissible in content and not in form. *Bender v. Norfolk S. Corp.*, 994 F. Supp. 2d 593, 599 (M.D. Pa. 2014).

Provided the moving party has satisfied its burden, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007). Instead, if the moving party has carried its burden, the non-moving party must then respond by identifying specific facts, supported by evidence, that show a genuine issue for trial, and it may not rely upon the allegations or denials of its pleadings. *See Martin v. Godwin*, 499 F.3d 290, 295 (3d Cir. 2007); *see also* Fed. R. Civ. P. 56(c). A non-moving party's failure to show a genuine issue of material fact for even one essential element of a claim after the moving party has met its burden renders all other facts immaterial, and it is enough to permit summary judgment for the moving party. *See Celotex*, 477 U.S. at 323. Further, once a moving party's burden has been met, a non-moving party's attack on settled legal precedent is also insufficient unless there is a significant justification for the opposition to precedent. *See Bucklew v. Precythe*, 139 S. Ct. 1112, 1126, 1134 (2019).

Also, once the moving party has satisfied the burden of proving there is no genuine issue of material fact, the non-moving party may not survive summary judgment by simply alleging that the moving party's discovery materials are incomplete or inconsistent. *See Williams v. Office of DA*, 751 Fed. Appx. 196, 199 (3d Cir. 2018) (citing *Podobnik*, 409 F.3d at 594). The non-moving party may request that the court compel discovery to address inconsistent and incomplete

discovery that may lead to evidence proving a genuine issue of material fact, but inconsistency and incompleteness of discovery is not inherently sufficient to prove the existence of a genuine issue of material fact. *See id.*

If the non-moving party requests to acquire contradictory evidence in the moving party's possession that is relevant to establishing a genuine issue of material fact, the court abuses its discretion if it does not properly consider the non-moving party's requests. *In re Avandia Mktg., Sales & Prods. Liab. Litig.*, 945 F.3d 749, 761 (3d Cir. 2019) (citing *Shelton v. Bledsoe*, 775 F.3d 554, 568 (3d Cir. 2015) (quoting *Murphy v. Millennium Radio Grp. LLC*, 650 F.3d 295, 309-10 (3d Cir. 2011))).

Once the evidence is gathered, the court is not to decide whether the evidence unquestionably favors one side or the other, or to make credibility determinations. *See Anderson*, 477 U.S. at 252. It instead must decide whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. *Id.*; *see also Big Apple BMW*, 974 F.2d at 1363. In reaching this determination, the Third Circuit has instructed:

> To raise a genuine issue of material fact . . . the opponent need not match, item for item, each piece of evidence proffered by the movant. In practical terms, if the opponent has exceeded the "mere scintilla" threshold and has offered a genuine issue of material fact, then the court cannot credit the movant's version of events against the opponent, even if the quantity of the movant's evidence far outweighs that of its opponent. It thus remains the province of the factfinder to ascertain the believability and weight of the evidence.

*Big Apple BMW*, 974 F.2d at 1363. In contrast, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks omitted); *NAACP v. North Hudson Reg'l Fire & Rescue*, 665 F.3d 464, 476 (3d Cir. 2011).

### C. LEGAL STANDARD FOR SCREENING COMPLAINTS FILED BY LITIGANTS PROCEEDING *IN FORMA PAUPERIS*

This Court has a statutory obligation to conduct a preliminary review of *pro se* complaints brought by litigants given leave to proceed *in forma pauperis*. Specifically, the Court is obliged to review the complaint in accordance with 28 U.S.C. § 1915(e)(2), which provides, in pertinent part:

> (2) Notwithstanding any filing fee, or any portion thereof, that may have been paid, the court shall dismiss the case at any time if the court determines that –
>
> > (A) the allegation of poverty is untrue; or
> >
> > (B) the action or appeal--
> >
> > > (i) is frivolous or malicious;
> > >
> > > (ii) fails to state a claim on which relief may be granted; or
> > >
> > > (iii) seeks monetary relief against a defendant who is immune from such relief.

In performing this mandatory screening function, the Court applies the same standard that is used to evaluate motions to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, which provides that a complaint should be

dismissed for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).

A complaint filed by a *pro se* litigant is to be liberally construed and "'however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.'" *Erickson v. Pardus,* 551 U.S. 89, 94 (2007) (*quoting Estelle v. Gamble,* 429 U.S. 97, 106 (1976)). Nevertheless, "pro se litigants still must allege sufficient facts in their complaints to support a claim." *Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239, 245 (3d Cir. 2013). Thus, a well-pleaded complaint must contain more than mere legal labels and conclusions. Rather, a *pro se* complaint must recite factual allegations that are enough to raise the Plaintiff's claimed right to relief beyond the level of mere speculation, set forth in a "short and plain" statement of a cause of action.

## IV.    ANALYSIS

### A.    PLAINTIFF HAS ABANDONED THIS LAWSUIT (*POULIS* ANALYSIS)

The United States Supreme Court has held that "[t]he authority of a court to dismiss sua sponte for lack of prosecution has generally been considered an 'inherent power," governed not be rule or statute but by the control necessarily vested in the courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases," *Link v. Wabash R. Co.*, 370 U.S. 626, 631 (1962). That authority however, while broad, is governed by certain factors, commonly referred

to as *Poulis* factors. As the United States Court of Appeals for the Third Circuit has

noted:

> To determine whether the District Court abused its discretion [in
> dismissing a case for failure to prosecute], we evaluate its balancing of
> the following factors: (1) the extent of the party's personal
> responsibility; (2) the prejudice to the adversary caused by the failure
> to meet scheduling orders and respond to discovery; (3) a history of
> dilatoriness; (4) whether the conduct of the party or the attorney was
> willful or in bad faith; (5) the effectiveness of sanctions other than
> dismissal, which entails an analysis of alternative sanctions; and (6) the
> meritoriousness of the claim or defense. *Poulis v. State Farm Fire and
> Cas. Co.*, 747 F.2d 863, 868 (3d Cir. 1984).

*Emerson v. Thiel College,* 296 F.3d 184, 190 (3d Cir. 2002).

In exercising this discretion "there is no 'magic formula' that we apply to

determine whether a District Court has abused its discretion in dismissing for failure

to prosecute." *Lopez v. Cousins*, 435 F. App'x 113, 116 (3d Cir. 2011) (quoting

*Briscoe v. Klaus*, 538 F.3d 252 (3d Cir. 2008)). Therefore, "[i]n balancing the *Poulis*

factors, [courts] do not [employ] a . . . 'mechanical calculation' to determine whether

a District Court abused its discretion in dismissing a plaintiff's case.." *Briscoe*, 538

F.3d at 263 (quoting *Mindek v. Rigatti,* 964 F.2d 1369, 1373 (3d Cir. 1992)).

Consistent with this view, it is well-settled that "no single *Poulis* factor is

dispositive," and that "not all of the *Poulis* factors need be satisfied in order to

dismiss a complaint." *Briscoe*, 538 F.3d at 263 (internal citations and quotations

omitted). Moreover, recognizing the broad discretion conferred upon the district

court in making judgments weighing these six factors, the court of appeals has

frequently sustained such dismissal orders where there has been a pattern of dilatory conduct by a *pro se* litigant who is not amenable to any lesser sanction. *See, e.g., Emerson,* 296 F.3d 184; *Tillio v. Mendelsohn*, 256 F. App'x 509 (3d Cir. 2007); *Reshard v. Lankenau Hospital*, 256 F. App'x 506 (3d Cir. 2007); *Azubuko v. Bell National Organization*, 243 F. App'x 728 (3d Cir. 2007).

In this case, a dispassionate assessment of the *Poulis* factors weighs in favor of the sanction of dismissal.

The first *Poulis* factor, the extent of Plaintiff's personal responsibility, weighs in favor of dismissal. Plaintiff is required to file a brief in opposition. LR 7.6. On October 17, 2019, Plaintiff was advised of this requirement in the Court's Standing Practice Order in *pro se* Plaintiff cases. (*See* Doc. 4). Plaintiff was also advised by the Court that his case may be dismissed if he failed to respond to Moving Defendants' Motion to Dismiss/Motion for Summary Judgment on three  (3) separate occasions. (Doc. 28, 30 and 42). As a *pro se* litigant, Plaintiff is responsible for his failure to file a brief in opposition to the pending Motion, as required by the Local Rules and by the Court's three Orders.

The second *Poulis* factor, the prejudice to Defendants caused by Plaintiff's failure to respond to Defendants' Motion, weighs against dismissal. Examples of prejudice are "the irretrievable loss of evidence, the inevitable dimming of witnesses' memories, or the excessive and possibly irremediable burdens or costs

imposed on the opposing party." *Scarborough v. Eubanks*, 747 F.2d 871, 876 (3d Cir. 1984). Prejudice for purposes of the *Poulis* analysis, however, does not mean irremediable harm. *Ware v. Rodale Press, Inc.,* 322 F.3d 218, 222 (3d Cir. 2003). "[T]he burden imposed by impeding a party's ability to prepare effectively a full and complete trial strategy is sufficiently prejudicial." *Id.* Although the resolution of this case has been delayed, in part, due to Plaintiff's failure to respond despite being granted multiple extensions of time (Docs. 33, 35, 42), and a sixty day stay in which the Court attempted to locate counsel on his behalf (Doc. 39), these delays do not appear to have prejudiced Moving Defendants' ability to prepare a defense in their Motion to Dismiss/Motion for Summary Judgment.

The third *Poulis* factor, history of dilatoriness, weighs against dismissal. While "conduct that occurs one or two times is insufficient to demonstrate a 'history of dilatoriness,'" *Briscoe,* 538 F.3d at 261, "[e]xtensive or repeated delay or delinquency constitutes a history of dilatoriness, such as consistent non-response to interrogatories, or consistent tardiness in complying with court orders." *Adams v. Trs. of N.J. Brewery Emp. Pension Trust Fund*, 29 F.3d 863, 874 (3d Cir. 1994). A "party's problematic acts must be evaluated in light of his behavior over the life of the case." *Id.* at 875. Reviewing the procedural history in this case, the delay caused by Plaintiff's failure to respond (excluding the stay) was not extensive. Furthermore, responding to Defendants' Motion to Dismiss/Motion for Summary Judgment was

Plaintiff's first significant deadline in this case. Plaintiff diligently sought extensions of time until a final deadline of July 12, 2021 was set by the Court in an Order issued on June 10, 2021. Thus, Plaintiff's dilatoriness cannot be characterized as "repeated."

The fourth *Poulis* factor, whether Plaintiff's failure to respond to Defendants' Motion was willful or in bad faith, weighs in favor of dismissal. "Willfulness involves intentional or self-serving behavior." *Adams,* 29 F.3d at 875. Courts have held where there is no indication that a plaintiff's failure to participate was from excusable neglect, "the conclusion that [his or her] failure is willful is inescapable." *Palmer v. Rustin*, No. 10-42, 2011 WL 5101774, at *2 (W.D. Pa. Oct. 25, 2011). In this case, there is no indication that Plaintiff's failure to respond or request an extension of time to respond is the result of excusable neglect. The Court's briefing order was sent to Plaintiff's current address at FCI Edgefield. Nothing suggests that Plaintiff did not receive that order.

The fifth *Poulis* factor, the effectiveness of other sanctions, weighs in favor of dismissal. Dismissal is a sanction of last resort, and it is incumbent upon a court to explore the effectiveness of lesser sanctions before ordering dismissal. *Poulis,* 747 F.2d at 868. Plaintiff is proceeding *pro se* and *in forma pauperis*, and there is no evidence to support a reasonable inference that he would be able to pay monetary sanctions. Moreover, Plaintiff's failure to comply with the Court's orders directing

him to file a brief in opposition leads to an inference that further orders would not be effective. Therefore, no other sanction would be effective.

The sixth *Poulis* factor, the meritoriousness of Plaintiff's claims, also weighs in favor of dismissal. After a comprehensive analysis of the Complaint, it appears that all claim against every Defendant should be dismissed under a 12(b)(6) standard except for three RFRA claims. The flaws inherent in all other claims asserted by Plaintiff in his Complaint are set forth below.

With respect to dismissal for Plaintiff's failure to respond to the Court's multiple briefing orders resulting in his abandonment of this case, factors one, four, five and six weigh in favor of dismissal, while factors two and three weight against dismissal. On balance, the case should be dismissed.

However, if Plaintiff responds to this Report with objections, his response may shift the Court's analysis of these factors. Therefore, I have provided an alternative recommendation that, if in fact Plaintiff has not abandoned this case, the three RFRA claims plausibly alleged by Plaintiff in his Complaint should be permitted to proceed.

## B. PLAINTIFF'S RFRA CLAIMS

In their June 1, 2020 Brief, Defendants suggest that RFRA expressly applies only to the United States, not their employees in their individual capacities. However, after their brief was filed (in December 2020) the United States Supreme

Court held that RFRA's express remedies provision may permit litigants to obtain money damages against federal officials in their individual capacities. *Tanzin v. Tanvir*, 141 S.Ct. 486 (2020). Based on *Tanzin*, the court should analyze the RFRA claims against individual defendants.

In Section B of his Complaint, Plaintiff alleges several claims under the Religious Freedom Restoration Act of 1993 ("RFRA"). 42 U.S.C. § 2000bb. Under the RFRA, the "Government shall not substantially burden a person's exercise of religion even if the burden results from a general rule of applicability," unless the government can demonstrate that "the burden to the person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1. Plaintiff bears the burden of pleading the elements of a prima facie case. Once a prima facie case has been established, the government bears the burden of showing a compelling interest that it used the least restrictive means to carry out that interest. *Post v. Holt,* No. 3:12-CV-1441, 2017 WL 3431921, at *11 (M.D. Pa. July 19, 2017). For an inmate to plead a plausible RFRA claim, he or she must allege facts that show the federal government substantially burdened a sincerely held religious belief. The Third Circuit has explained that a "substantial burden" exists where:

> (1) a follower is forced to choose between following the precepts of his religion and forfeiting benefits otherwise available to other inmates versus abandoning one of the precepts of his religion in order to receive a benefit; or

(2) the government puts substantial pressure on an adherent to substantially modify his behavior to violate his beliefs.

*Garraway v. Lappin,* 490 F. App'x 440, 444 (3d Cir. 2012) (*quoting Washington v. Klem*, 497 F.3d 272, 280 (3d Cir. 2007)).

Moving Defendants argue:

Under the "substantial burden" test explained in *Garraway*, Doss did not, and cannot, provide evidence that the accommodations made by the Defendant chaplains at Allenwood and McKean "substantially burden" his religious practices. Doss did not have to choose between his religion and forfeiting a benefit available to other inmates. In fact, the record shows that the United States repeatedly responded to Doss' requests with reasonable accommodations. Even in those instances where Doss did not get what he wanted, it was a consequence of his own inattention; for instance, Doss never completed a New and Unfamiliar Component Request or Doss's failure to sign up for religious events. SMF ¶¶ 2-38. Likewise, the government never put substantial pressure on Doss to modify his behavior in a way that violated his beliefs. *Id.* Consequently, Doss cannot shift the burden to the United States to demonstrate a compelling interest for its actions or that it used the least restrictive means.

(Doc. 26, p. 22).

Plaintiff has not filed a response to the Defendant's Statement of Material Facts. Therefore, pursuant to Local Rule 56.1, the following facts are undisputed:

2.    The United States Department of Justice, Federal Bureau of Prisons (BOP), employs Defendant Brian Cieslukowski as the supervisory chaplain for the Federal Correctional Complex Allenwood. Ex. 1, Decl. of Brian Cieslukowski ¶ 1.

3.    The United States [Department] of Justice, Federal Bureau of Prisons, employs Defendant Richard Glogau as a supervisory chaplain for the Federal Correctional Institution McKean (FCI McKean). Ex. 2, Decl. of Richard Glogau ¶ 1.

4.     In Defendant Cieslukowski's role as Supervisory Chaplain for FCC Allenwood, he makes sure that inmates are free to practice their beliefs within the confines of a secure institution. Ex. 1 ¶ 2.

5.     Doss was not "flat out" denied any religious practice for a security reason. *Id.* ¶¶ 3-5.

6.     Numerous reasonable accommodations were made for Doss and other inmates of his faith and similar interpretation. *Id.* ¶¶ 6-7.

7.     With regard to Baptism, after numerous conversations with Doss, the accommodation was offered to fill the Baptismal tub and each requesting inmate could take part in a personal ritual submersion on the approved day. *Id.* ¶ 8.

8.     The inmates were satisfied with this accommodation. The service provided was well received by all inmates who shared Doss' faith group. *Id.*

9.     Inmate Dickens was housed at USP Allenwood not FCI Allenwood with Doss, and to Defendant Cieslukowski's knowledge has never baptized anyone at USP Allenwood.

10.    With regard to "New Moon Services" Doss sought certain provisions, and after numerous conversations with Doss an accommodation was offered; however it was unsatisfactory to Doss. *Id.* ¶ 10.

11.    The "provisions" that Doss sought were of his interpretation and not widely accepted. *Id.*

12.    All religious materials provided by BOP chaplains at FC[I] Allenwood were appropriate and equal. Furthermore, inmates can purchase individual materials via special order forms, which Doss did not do. *Id.* ¶ 11.

13.    During the October 2017, Yom Kippur, Doss was ultimately provided a pre and post fasting meal, it was just not satisfactory to Doss. This did get addressed and corrected for future fasts, and the issue was communicated to food services. *Id.* ¶ 12.

14.    Additionally, Sukkot 2017 accommodations were appropriate and participants were allowed access to the Sukkot tent for meals, services, and prayer. *Id.* ¶ 13.

15.    In 2017, the Messianic and Jewish inmates shared a tent as was done in previous years. *Id.*

16.    In 2018, and in the years following, two tents were used so that each group had their own tent. *Id.*

17.    In December 2017, Chanukah accommodations were appropriate. The request for plain menorahs was made at the last minute and was not accommodated. *Id.* ¶ 14.

18.    In the years that followed, the images were covered with papers and this seemed to satisfy participants of Doss' faith group. *Id.* ¶ 14.

19.    The Allenwood Chaplains discussed a litany of Doss' issues [(]with Doss) which included: "Black Nazarene Messianic" inmates were forced to use unleavened bread matza instead of Challah bread, all Saturday meals bagged and ready on Fridays, so that Doss "wouldn't have to travel" to the dining hall on Saturdays, and that Sabbath services in the chapel, which had Christian symbols, pagan symbols, and a "white Christ," and it was explained why these requests, concerns, allegations were denied. *Id.* ¶ 15.

20.    Doss was not allowed to wear a colored head covering because it did not comply with Bureau of Prisons policy, and head coverings need to comply with policy because some inmates use head coverings as ways to identify with specific gangs and other security threat groups in federal prison. *See* Program Statement, 5360.09 Religious Beliefs and Practices. *Id.* ¶ 16.

21.    The messianic faith group was not authorized three congregational prayers in the chapel. Inmates could pray on their own which was the guidance on prayer at that time. Currently inmates are able to pray in groups on the basis that other group activity is allowed in each area of the institution. *Id.* ¶ 17.

22.    There were materials, (DVDs and Books) that were purchased for the Messianic community as requested. *Id.* ¶ 18.

23.    Doss was not denied access to any visitors or outside contacts with "Black Nazarene Messianic" leaders. Doss' views changed often, and his unique set of beliefs did not agree completely with any particular group. Based on Doss' handpicked pieces from many different messianic groups that he adhered to, it made finding appropriate volunteers impossible. *Id.* ¶ 19; Attach. 1, Oct. 12, 2017, "cop out"; Attach 2, Nov. 6, 2017, "cop out".

24.    The Messianic materials were kept in an appropriate location in the chapel area. *Id.* ¶ 20.

25.    Defendant Chaplain Glogau, provided Doss with the same provisions for the 2018 Passover as was provided by FC[I] Allenwood in 2017, (a chicken neck bone instead of a lamb). Ex. 2, ¶ 7.

26.    Defendant Chaplain Glogau never processed Doss's "New Religious Component" incomplete form. *Id.*

27.    The same chicken neck bone, instead of lamb, was provided for the 2019 Passover. *Id.*

28.    Defendant Chaplain Glogau explained to Doss that his religious issues surrounding the neck bone were being looked into. Ex. 2 ¶ 8.

29.    Doss did request a lamb bone for Passover, and after all staff spending ample time researching the request and trying to find a lamb shank that was Kosher for Passover, it was concluded that a chicken neck bone was a reasonable accommodation for the Passover Seder. The Messianic community accepted this reasonable accommodation. *Id.*

30.    Defendant Chaplain Glogau encouraged Doss to do a New and Unfamiliar Component request and Doss submitted an incomplete request. *Id.* ¶ 9.

31.    It was explained to Doss how important it was to have all the information requested, and could only help him by getting more details; however, Doss never returned for assistance in completing the form. *Id.*

32.    Doss was provided Passover meal, (which is 8 days), and is celebrated within the Messianic/Jewish community as their Ceremonial

Meal, which has been the past practice of the Messianic community. *Id.* ¶ 10.

33.    Additionally, every instruction sets their own dates for the ceremonial meal, and Doss was treated like other similarly situated inmates. *Id.* ¶ 11.

34.    In 2018 and 2019, Doss had a PPD skin test for TB instead of a chest x-ray or spit test. Medical policy clearly states that everyone will be tested for TB and there is no religious exclusion that was in Policy Statement 5360.09. *Id.* ¶ 12; *see also* PS 5360.09.

35.    In 2018 Doss was permitted to participate in the Feast of Trumpets, Feast of Tabernacles/Sukkot, and Feast of Atonement because he was a new arrival.

36.    Doss was instructed that all inmates must sign-up 30 days in advance of the holy day to be able to participate. Instruction on how and where an individual can sign-up for faith group holy days is given during inmate orientation. Doss was given several reminders to sign-up for the holy days events. *Id.* ¶¶ 13-14; *see also* MCK 5360.09i, Institution Supplement.

37.    In 2019, Doss was unable to participate in a few events because he did not request participation within the 30 day window. The book to sign-up for all religious events is in the Religious Service Assistant's office and is available when requested by religious participants. *Id.* ¶ 15.

38.    Doss is in the chapel on most Friday evenings, and there are postings on the inmate's e-mails and messages, posted in the Chapel and posted on every faith group locker with the holy days, fasts and ceremonial meals. *Id.*

(Doc. 27, ¶¶ 2-38).

With these undisputed facts in mind, I will next analyze each of Plaintiff's allegations.

### 1.    Plaintiff's Request to Hold Baptism Ceremonies

Plaintiff alleges that Defendant Cusiluwsky would not allow Plaintiff's faith group to hold baptisms. (Doc. 1, p. 4). It is undisputed that, after numerous conversations with Plaintiff, the following accommodation was offered: "to fill The Baptismal tub and each requesting inmate could take part in a personal ritual submersion on the approved day." (Doc. 27-1, p. 2). The other inmates in Plaintiff's faith group were satisfied with this accommodation. *Id.* Nothing in the record on summary judgment suggests the accommodation offered placed a substantial burden on Plaintiff's ability to practice his faith.

Accordingly, Defendants are entitled to summary judgment as to this claim.

### 2.    Plaintiff's Request to Hold New Moon Services

Plaintiff alleges that "from April 2017 until January 2018" he requested "New Moon Provision and Service." (Doc. 1, pp. 4-5). The record on summary judgment includes the following email from Plaintiff to Defendant Cusiluwsky:

> I request that we have a new moon service scheduled for between nov 19 2017 and sunset nov 20th 2017 sunset which will require all kiddush provision mottza which represent the sacrifice of yashua and callah bread which is for messianic believer and is commanded scripture that are sacred loaves after pass over be with leaven representing the leaven of the kingdom and a risen christ honey for the anointing of YAHAWAH spirit and his sweet work Frankinsece for are insent that are able to burn through the entire service and the proper amount of grape juice per person 5.7 chabod . org is how we practice this provision this is faith notice you said a week in advance when we spoke before about it this is timely notice this is a special service that we are suppose to have every month scripture dais the realm open on the sabbath and

the new moon this is for us to here from YAHAWAH from heaven in a special way please don't hinder us from the way we practice as are ancestor did.

(Doc. 27-1, p. 7). In response, Defendant Cusiluwsky wrote:

yaiy.org was contacted, they stated that congregate services are not held for the new moon. It is an individual prayer. If your faith practice is different place [sic] provide information about the practice and how messianic communities observe the new moon. A new and or unfamiliar religious component questionnaire may be necessary.

*Id.* In his declaration, Defendant Cusiluwsky stated that "after numerous conversations with inmate Doss an accommodation was offered; however it was unsatisfactory to inmate Doss. (Doc. 27-1, p. 2). The record on summary judgment is undisputed that congregate services are not typically held by followers of Plaintiff's faith for the new moon. Plaintiff has provided no evidence to rebut this, or to show that his individual faith practice is different. Thus, on this record I am compelled to conclude that the failure to provide a congregational new moon service does not substantially burden the exercise of Plaintiff's region.

Accordingly, Defendants are entitled to summary judgment as to this claim.

### 3. Inadequate Provisions and Materials at 2017 Feast of Trumpets

Plaintiff alleges that his faith group was not given certain "individual materials" (prayer rugs, prayer shawls, religious texts) and was not given as many provisions by food service as the white inmates. (Doc. 1, p. 7).

It is undisputed that Plaintiff may purchase "individual materials," via special order forms. (Doc. 27-1, p. 2). Plaintiff never attempted to purchase such materials. *Id.* Furthermore, it is undisputed that there were materials (DVDs and Books) that were purchased for the Messianic Community. (Doc. 27, ¶ 22). Accordingly, I find that Plaintiff's ability to practice his religion was not substantially burdened by Defendants' failure to provide prayer rugs, prayer shawls, or specific religious texts, and DVDs because some items were available and Plaintiff is permitted to purchase many of the items that the prison does not provide.

It is undisputed that on the summary judgment record, all provisions provided during the feast of trumpets were "appropriate and equal." (Doc. 27-1, p. 2). There was no burden placed on the exercise of Plaintiff's faith by the "appropriate and equal" provisions.

Accordingly, Defendants are entitled to summary judgment as to this claim.

### 4.      Inadequate Meals and Materials for Yom Kippur 2017

Plaintiff alleges that his faith group fasts for 26 hours on Yom Kippur. (Doc. 1, p. 7). He alleges that he was given a 1000 calorie meal following his fast, but was entitled to a 2,500 calorie meal. *Id.* He also alleges that, like for the Feast of Trumpets, his group was not given adequate books, prayer rugs, prayer shawls, and candles.

It is undisputed that Plaintiff was provided with a pre- and post- fast meal. (Doc. 27, ¶ 13). These meals were not to Plaintiff's liking. (Doc. 27-1, p. 3). This issue was addressed and corrected with food service for future fasts. *Id.* The burden to the exercise of Plaintiff's faith caused by the 2017 Yom Kippur pre and post fast meals was temporary in nature, and is therefore not a substantial burden on Plaintiff's exercise of his religion. *Cf. Gibson v. Heary,* 2021 WL 854736 at *6 (W.D. N.Y. Mar. 5, 2021) (noting that the periodic denial of religious meals to a state inmate was not a substantial burden on the exercise of religion as required under the First Amendment and RLUIPA).

To the extent Plaintiff alleges his group was not given "individual materials" and inadequate supplies, the same reasoning set forth in Section IV. B. 3. applies.

Accordingly, Defendants are entitled to summary judgment as to these claims.

### 5. Inadequate Materials and Provisions the 2017 Feast of Tabernacles

Plaintiff requested a 20-man sukkot tent for the 2017 Feast of Tabernacles. (Doc. 1, p. 8). Instead, Plaintiff's group was required to share a 6 man sukkot tent with another religious group. *Id.* Plaintiff also alleges that his faith group was denied Kiddush provisions for their service.

It is undisputed that in 2017, Plaintiff's group was allowed access to the Sukkot test for meals, services and prayer. (Doc. 27-1, p. 3). In 2018, and in the years following, two tents were used, so that each group had their own tent. *Id.* Plaintiff,

along with other members of his faith group, were allowed access to the Sukkot tent in 2017 and had a separate Sukkot tent in 2018, therefore Plaintiff's faith was not substantially burdened.

Furthermore, based on his own allegations, the failure to provide Kiddush provisions for the service was corrected. Therefore, this failure did not substantially burden Plaintiff's ability to celebrate the Feast of Tabernacles in 2017.

Accordingly, Defendants are entitled to summary judgment as to this claim.

### 6.    Inadequate Menorah in December 2017

Plaintiff alleges that in December 2017 Defendants Cusiluwsky and Moore provided Plaintiff and his group with a "filthy" 9-candle menorah with traditional Jewish engravings on it. (Doc. 1, p. 12). It is undisputed that on in December 2017, Plaintiff's group made a "last minute" request for a plain menorah that could not be accommodated. (Doc. 27-1, p. 3). In the years that followed, the images on the menorah were covered with paper, and this accommodation seemed to satisfy Plaintiff's faith group. *Id.* Courts have found that providing a defective menorah did not substantially burden an inmate's exercise of his faith. *Cf. Lombardo v. Freebern,* No. 16-CV-7146, 2018 WL 1627274 (S.D. N.Y. March 30, 2018) (finding that a state inmate's claim of a broken menorah with missing lightbulbs was insufficient to support a First Amendment Free exercise, or RLUIPA claim).

Accordingly, Defendants are entitled to summary judgment as to this claim.

### 7.     Denial of Request for Special Meal Bags Every Friday

Plaintiff alleges that he requested that food service prepare a cold Kosher meal in a paper back for him on Friday afternoons so that he did not need to "travel" to the cafeteria on the Sabbath or engage in the "work" of picking up his meals. (Doc. 1, p. 13). Plaintiff was asked to fill out an "Unfamiliar Religious Component" form, and discussed the issue with the chaplains. (Doc. 27-1, p. 3). It is undisputed that, upon receipt of this request the chaplains researched the issue and concluded that "there was no burden on the inmate to walk to the dining facility to eat his meals." (Doc. 27-1, p. 3). Thus, on this record, it is undisputed that the failure to accommodate this request did not substantially burden Plaintiff's ability to exercise his religion.

Accordingly, Defendants are entitled to summary judgment as to this claim.

### 8.     Symbols in the Chapel at Allenwood

Plaintiff alleges that he and his group were "forced to keep Sabbath Service in a room with idols, graven Christian images with the white image of the Christ of Christian religion surrounding the room." (Doc. 1, p. 14). It is undisputed that Plaintiff was given access to the same chapel area as all inmates. (Doc. 27-1, p. 4). However, the fact that Plaintiff was given access to the same chapel area as all inmates is not material to the issue of whether the presence of other religious icons substantially burdened the exercise of Plaintiff's religion. Presented this with

information, a reasonable jury could still find that Plaintiff's faith was substantially burdened by the presence of these religious icons in the chapel at Allenwood.

Accordingly, Defendants are not entitled to summary judgment as to this claim at this time, but may further develop this issue in a new motion for summary judgment after the close of discovery.

### 9.   Religious Head Covering

Plaintiff alleges that his purple and gold religious head covering was confiscated. (Doc. 1, p. 15). It is undisputed that prison policy prohibits "colored" head coverings. (Doc. 27-1, p. 4).[7] It is also undisputed that Plaintiff's purple and gold head covering does not comply with the policy. However, the mere fact that policy forbids the wearing of a purple head covering is not material to the issue of whether the policy itself substantially burden's Plaintiff's exercise of his religion. Presented with only this information, a reasonably jury could still find that Plaintiff's

---

[7]   In their Statement of Facts, Defendants cite to BOP Program Statement 5360.09. Although the declaration suggests the policy is attached, the Court's copy does not appear to include this attachment. This statement is available on the BOP's public website.

This policy statement explains that religious headwear worn throughout the institution must be black or white. The only exception is that the Rastafarian crown may be black with red, yellow and green threads running through it, and that a native American headband may be multi-colored. *See* Program Statement 5360.09 *available at* https://www.bop.gov/policy/progstat/5360_009.pdf (last visited Sept. 21, 2021).

faith was substantially burdened by the policy prohibiting wearing a purple head covering.

Accordingly, Defendants are not entitled to summary judgment as to this claim at this time, but may further develop this issue in a new motion for summary judgment after the close of discovery.

### 10. Denial of Request for Three Congregational Prayer Services Each Day

Plaintiff alleges that his request for the opportunity to conduct three congregational prayer services with his faith group was denied. (Doc. 1, p. 17). Plaintiff also alleges that when his group prayed together outside the chapel they were subject to prison disciplinary action. *Id.* Defendants do not dispute that Plaintiff's request was denied. It is also undisputed that "inmates are able to pray in group on the basis that other group activity is allowed in each area of the institution. (Doc. 27-1, p. 4). Thus, Plaintiff's ability to engage in congregational prayer is not substantially burdened because he can engage in congregational prayer in other areas of the institution.

Accordingly, Defendants are entitled to summary judgment as to this claim.

### 11. Failure to Provide Lamb Shank for Passover 2018

Plaintiff alleges that Defendant Cusiluwksy agreed to provide Plaintiff's faith group with lamb shank, instead of chicken neckbone, for Passover 2018 at FCI

Allenwood. (Doc. 1, pp. 17-18). Then, Plaintiff was transferred to a different facility (FCI McKean), where chicken neckbone was provided. *Id.*

Nothing in the record on summary judgment confirms whether lamb shank was provided at FCI Allenwood for Passover 2018. However, Plaintiff was not there. He was at FCI McKean. Therefore, it is not material to whether his ability to celebrate Passover in 2018 was substantially burdened.

It is undisputed that a chicken neckbone was provided to Plaintiff's faith group instead of lamb for Passover 2018. (Doc. 27-1, p. 11). Defendant Glogau's declaration suggests that Plaintiff submitted a "New Religious Component" form, but it was not processed because it was incomplete. *Id.* The staff at FCI McKean did research the issue, and attempt to find a Kosher lamb shank, but concluded that it was not a reasonable accommodation. *Id.* The Messianic community accepted the chicken neck bone. *Id.* Given that the record on summary judgment is undisputed that providing a chicken neck bone is a reasonable substitute for lamb shank, I am compelled to find that Plaintiff's faith was not substantially burdened by this practice.

Accordingly, Defendants are entitled to summary judgment as to this claim.

### 12. Failure to Provide Ceremonial Fast Meal for Purim Instead of Passover in 2018

Plaintiff alleges that, while at FCI Allenwood, he sought a religious accommodation for his faith group to have their annual ceremonial feast meal on

Purim (in March) instead of on Passover (in April). (Doc. 1, pp. 18-19). Plaintiff alleges that when he was transferred to FCI McKean, the annual ceremonial feast for his faith group was still held on Passover. *Id.* On the summary judgment record, however, it is undisputed that the annual ceremonial feast meal for the Messianic community at FCI Allenwood is Passover, not Purim. (Doc. 27-1, p. 11). Furthermore, "contrary to Doss's claims, the Passover meal, (which is 8 days), is celebrated within the Messianic/Jewish community as their Ceremonial Meal, which has been the past practice for the Messianic community. *Id.* Given this undisputed evidence, I am compelled to find that Plaintiff's exercise of his faith was not substantially burdened by holding his faith group's ceremonial meal on Passover.

Accordingly, Defendants are entitled to summary judgment as to this claim.

### 13. Failure to Let Plaintiff Participate in 2018 Feast of Trumpets, Feast of Tabernacles, and Day of Atonement

Plaintiff alleges that, while at FCI Mckean, he was not allowed to attend the Feast of Trumpets, Feast of Tabernacles, and Day of Atonement because he was not "signed up." (Doc. 1, p. 21). Plaintiff believed that at his initial meeting with the chaplains at FCI McKean he was "signed up for all holidays." *Id.* On the summary judgment record, it is undisputed that Plaintiff was permitted to participate in events in 2018 because he was a new arrival. (Doc. 27-1, p. 12). Defendant Glogau reported that BOP policy requires that inmates sign up 30 days in advance of a holy day in order to be able to participate, and that Plaintiff missed a few events in *2019* because

he did not sign up. *Id.* Plaintiff received several reminders to "sign up" in 2019. *Id.* Plaintiff's ability to participate in holy days was not substantially burdened because was permitted to participate in the 2018 holy days at FCI McKean, and would have been permitted to participate in all 2019 events had he signed up.

Accordingly, Defendants are entitled to summary judgment as to this claim.

### 14.    PPD Tuberculosis Test

Plaintiff alleges that in 2018 and 2019, Plaintiff was forced by Defendants Wright and Asp to submit to a PPD skin test for TB. It is undisputed that "medical policy clearly states that everyone will be tested for TB, there is no religious exclusion that was in 5360.09." (Doc. 27-1, p. 12). Although Defendant Glogau's declaration indicates this policy is attached, it does not appear to be appended to the declaration, and Defendants do not cite to where it appears in the 150 pages of exhibits submitted. Furthermore, Plaintiff's objection is not to being tested, but specifically to the PPD test. Courts have found that conduct involving the administration of a PPD test, like that complained of here may substantially burden the exercise of an inmate's religion. *See e.g. Karolis v. New Jersey Dep't of Corr.*, 935 F. Supp. 523 (D. N.J. 1996) (finding that a choice submitting to a Mantoux a.k.a. PPD test or suffering solitary confinement, administrative segregation and loss of commutation time is a "substantial burden.").

Moving Defendants argue that summary judgment should be granted on this claim in favor of Defendant Wright as to claims related to the PPD test because: (1) Defendant Wright did not administer the PPD test, and (2) because Defendant Wright is immune. With respect to a lack of involvement, this theory is not borne out by their own statement of facts, which suggests that it was Defendant Wright who consulted Defendant Glogau about the PPD test. Furthermore, Defendants' arguments are not supported by the records they cite to. The only evidence cited (Doc. 27, ¶ 34; Doc. 27-1, p. 12) does not support their allegations that Defendant Wright is a commissioned officer or employee of Public Health Service, or that Defendant Wright was not the person who administered a PPD test in 2018 or 2019. Defendant's claim that Wright, as a U.S. Public Health Service Officer (Doc. 26, at p. 17, Argument VI) has immunity is not sufficiently developed. Wright is not being sued for "personal injury, including death resulting from the performance of medical … or related functions" triggering the Public Health Service Act immunity. *See* 42 U.S.C. § 233(a).  (Doc. 26 at p. 23).  The claim against Wright is for religious right infringement, not a negligent tort claim.

Accordingly, Defendants are not entitled to summary judgment as to this claim at this time but may further develop this issue in a new motion for summary judgment after the close of discovery.

As to Defendant's Glogau and Wright, employees at FCI McKean, the Government also argues that venue is improper as against them here in the Middle District (Doc. 26, p. 13). The Government argues that the claims against two persons (Glogau & Wright) involve incidents that occurred at FCI McKean, in the Western District of Pennsylvania and therefore venue as to them is improper. Defendants ignore the first subsection of the venue statute which states:

> "(b) Venue in general.--A civil action may be brought in--
> (1) a judicial district in which <u>any</u> defendant resides, <u>if all</u> defendants are residents of the State in which the district is located; (<u>emphasis added</u>)…"

In this case the events complained of took place in both the Middle (FCI Allenwood) and Western (FCI McKean) Districts of Pennsylvania. The only evidence in the record about Glogau and Wright is that they are employees at FCI McKean. Absent some proof that they are not residents of Pennsylvania (the Defendant's brief only argues that they are not residents of this district, *see* Doc. 26, p.19) venue is proper in this district. The request that claims against Glogau and Wright be dismissed on venue grounds should be denied.

### C. PLAINTIFF'S FIFTH AMENDMENT *BIVENS* CLAIMS AGAINST THE INDIVIDUAL BOP DEFENDANTS SHOULD BE DISMISSED

Although Congress established a damages remedy under 42 U.S.C. § 1983 against state officials for violations of the federal constitution, it did not create an analogous statute for damages against federal officials. In *Bivens v. Six Unknown*

*Named Agents of Federal Bureau of Narcotics*, however, the Supreme Court "recognized for the first time an implied private action for damages against federal officers alleged to have violated a citizen's constitutional rights." *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 66 (2001). "[A]ctions brought directly under the Constitution against federal officials have become known as '*Bivens* actions.'" *Vanderklok v. United States*, 868 F.3d 189, 198 (3d Cir. 2017).

In *Bivens*, agents acting under claim of federal authority entered a man's apartment without a warrant, arrested and handcuffed him, and searched the residence for drugs. *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 389 (1971). Thereafter, the man was taken to a courthouse, interrogated, booked, and subjected to a visual strip search. *Id.* The man sued the agents for damages, alleging that the warrantless search and the arrest violated his rights under the Fourth Amendment to the United States Constitution. *Id.* The District Court dismissed the man's lawsuit because the man failed to state facts making out a cause of action. *Id.* at 390. The Court of Appeals affirmed. *Id.* The Supreme Court reversed. In doing so, the Court held that there is an implied private cause of action for damages for a federal officer's violation of a person's Fourth Amendment rights and explained that while Congress had not created a private cause of action against federal officials for damages, the Supreme Court has the power to

"adjust . . . remedies so as to grant the necessary relief" to protect a constitutional right." *Id.* at 392.

Since *Bivens* was decided in 1971, the Supreme Court "has repeatedly refused to extend *Bivens* actions beyond the specific clauses of the specific amendments [of the Constitution] for which a cause of action has already been implied, or even to other classes of defendants facing liability under those same clauses." *Vanderklok*, 868 F.3d at 200. As noted recently by another Court, the Supreme Court has recognized an implied private action against federal officials in only three cases:

> (1) *Bivens* itself—"a claim against FBI agents for handcuffing a man in his own home without a warrant" under the Fourth Amendment; (2) "a claim against a Congressman for firing his female secretary" under the Fifth Amendment; and, (3) "a claim against prison officials for failure to treat an inmate's asthma" under the Eighth Amendment.

*Karkalas v. Marks*, No. 19-1948, 2019 WL 3492232 at *7 (E.D. Pa. July 31, 2019) (internal footnotes omitted). Because expanding *Bivens* is "a 'disfavored' judicial activity," *See Ziglar v. Abbasi*, 137 S.Ct. 1843, 1857 (2017), a "rigorous injury . . . must be undertaken before implying a *Bivens* cause of action in a new context or against a new category of defendants," *Vanderklok*, 868 F.3d at 200.

The first step of this inquiry is to determine whether the claims at issue present a new context. A *Bivens* claim presents a new context if "the case is different in a meaningful way from previous *Bivens* cases decided by" the Supreme Court. *Ziglar*,

137 S. Ct. at 1859. Examples of "meaningful differences" include but are not limited to:

> The rank of the officers involved; the constitutional right at issue; the generality of specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider.

*Ziglar*, 137 S. Ct. at 1848. Furthermore, as discussed above, Courts have declined to extend *Bivens* beyond the specific clauses of already recognized claims or to new classes of defendants. Therefore, a material difference exists when a claim is asserted under a different clause of a constitutional amendment that has been found to give rise to a *Bivens* claim, or where the claim involves a new class of defendants.

Once the Court has identified that the claim presents a new context, it must decide whether to imply a new *Bivens* remedy to that claim. In doing so, the Court should consider: (1) whether there is any "alternative, existing process capable of protecting the constitutional interests at stake," *Vanderlock*, 868 F.3d at 200; and (2) whether there are "special factors counseling hesitation in the absence of affirmative action by Congress," *Ziglar*, 137 S. Ct. at 1857.

In conducting the special factors inquiry, the court "must concentrate on whether the Judiciary is well suited, absent congressional action or instruction, to

consider and weigh the costs and benefits of allowing a damages action to proceed.

*Id*. at 1857. As discussed in *Ziglar*:

> [I]f there are sound reasons to think Congress might doubt the efficacy or necessity of a damage remedy as part of the system of enforcing the law and correcting a wrong, the courts must refrain from creating the remedy in order to respect the role of Congress in determining the nature and extent of federal-court jurisdiction under Article III.

*Id.* at 1858. Thus, Courts should assess the impact on governmental operations systemwide, including the "burdens on Government employees who are sued personally, as well as the projected costs and consequences to the Government itself . . . ." *Id.*

Plaintiff alleges that Part C of his Complaint contains, "[s]pecific overt acts of racial and religious discrimination against Plaintiff and Hebrew Israelite Nazarene (black) Messianic banner inmates by Defendants." (Doc. 1, p. 22). I construe this section of the Complaint as Plaintiff's Fifth Amendment claims. In this section of his Complaint, Plaintiff discusses conduct by the following Defendants: Cusiluwsky, Kim, Moore and Glogau.

In support of his claims, Plaintiff alleges: (1) Defendant Cusiluwsky refused to provide Hebrew Root DVDs (with a black Jesus) and only had a gospel DVD using the "white image of Christ" available; (2) Defendant Cusiluwsky refused to provide "Hebrews to Negros" DVDs or books, but did provide materials to "white European Christians, Nation of Islam, Moorish Science Temple of America (black

Moslems), Sunni Muslims (Arab), Native Americans, and Santeria"; (3) Defendant Cusiluwsky refused to permit Plaintiff's groups to have paid contractors, special visitors, and conference calls with churches, but allowed such things for other groups; (4) Defendant Cusiluwsky did not provide Plaintiff's group with its own personal religious locker, but all other groups had one; (5) Defendant Cusiluwsky denied Plaintiff's request to see an outside rabbi; (6) Defendant Cusiluwsky provided better treatment to white Messianic inmates (use of better facilities and more provisions for services, did not require white inmates to file New Religious consent forms); (7) Defendant Cusiluwsky allowed white Christian inmates to perform baptisms but would not allow the black inmates in Plaintiff's group to do so; (8) Defendant Cusiluwsky provided preferential treatment to white inmates on Yom Kippur, and the Feast of Tabernacles. (Doc. 1, pp. 22-27).

### 1.   Plaintiff's Fifth Amendment Due Process Claim Should be Dismissed

Rule 8 of the Federal Rules of Civil Procedure explains that, a Complaint must contain, "a short and plain statement showing that the pleader is entitled to relief." Fed. R. Civ. P. 8. Dismissal under Rule 8 is appropriate when a complaint leaves "the defendants having to guess what of the many things discussed constituted [a cause of action];" *Binsack v. Lackawanna County Prison*, 438 F. App'x 158 (3d Cir. 2011), or when the complaint is so "rambling and unclear" as to defy response. *Tillio v. Spiess*, 441 F. App'x 109 (3d Cir. 2011). Similarly, dismissal is appropriate in

"'those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised.'" *Tillio v. Spiess*, 441 F. App'x 109, 110 (3d Cir. 2011) (quoting *Simmons v. Abruzzo,* 49 F.3d 83, 86 (2d Cir. 1995)); *Tillio v. Northland Grp. Inc.*, 456 F. App'x 78, 79 (3d Cir. 2012).

I agree with Moving Defendants that the nature of Plaintiff's Fifth Amendment Due Process claim is so well-disguised that it does not place Defendants on notice as to how Plaintiff's due process rights were violated or by who. Thus, Plaintiff's Fifth Amendment Due Process claim should be dismissed.

### 2. Plaintiff's Fifth Amendment Equal Protection Claim

Plaintiff alleges that he, and his religious group, are being treated differently by BOP staff than similarly situated groups composed of white inmates. Moving Defendants do not address this claim.

The Supreme Court has extended a *Bivens* remedy to one type of Fifth Amendment Equal Protection claim in *Davis v. Passman*, 442 U.S. 228, 248-49 (1979). In *Davis*, an administrative assistant alleged that a Congressman discriminated against her on the basis of gender. *Id.* However, the claim in *Davis* is meaningfully different than the one asserted by Plaintiff in this case because it involves a different class of defendants. *See Railey,* 407 F. Supp.3d at 522 (collecting cases in which courts found that Fifth Amendment due process and equal protection claims asserted by inmates in the prison setting are meaningfully different than

*Davis*). Thus, the Court must consider whether any alternative remedies exist and whether special factors counsel against extending a *Bivens* remedy before deciding whether to extend such a remedy to this claim.

As a federal inmate, Plaintiff has remedies other than a *Bivens* claim to protect his rights. First, Plaintiff has access to the Bureau of Prison's internal remedy system to address his complaints. *See* 28 C.F.R. § 542.10-542.19. The Supreme Court has noted that "when alternative methods of relief are available, a *Bivens* remedy usually is not. Thus the availability of an alternative remedial structure may, on its own, prevent courts from expanding *Bivens*." *Mack v. Yost*, 968 F.3d 311, 320 (3d Cir. 2020). However, even if this remedy were not available, special factors counsel hesitation in expanding *Bivens* into this new context the absence of affirmative action by congress.

Concern over separation of powers, and judicial interference with the management of prisons weighs heavily against extending a *Bivens* remedy to Plaintiff's Fifth Amendment equal protection claim. "[A]s other courts have recognized, special factors exist counseling against the expansion of *Bivens* Fifth Amendment [due process and equal protection] claims, such as Congress' decision to not provide a damages remedy for certain violations and the financial burden on federal agencies resulting from litigation." *Railey*, 407 F.Supp.3d at 523 (citing *Ojo v. United States*, 364 F.Supp.3d 163, 175-76 (E.D. N.Y. 2019); *Hunt v. Matevousian*,

336 F.Supp.3d 1159, 1169 (E.D. Cal. 2018); *Vanaman v. Molinar,* No. CV-17-00222-TUC-JGZ, 2018 WL 4698655, at *4 (D. Ariz. Sept. 28, 2018)). "Furthermore, 'the judicial restraint exercised in cases implicating the administration of prisons' is another factor weighing against extension of the *Bivens* remedy." *Id.* (quoting *Thomas v. Paul*, No. 16-CV-12-SM, 2019 WL 4451349, at *5 (D.N.H. Sept. 17, 2019).

Accordingly, Plaintiff's Fifth Amendment equal protection claim should be dismissed.

### D.   PLAINTIFF FIRST AMENDMENT BIVENS CLAIM AGAINST THE INDIVIDUAL BOP DEFENDANTS SHOULD BE DISMISSED

In the preface to Part D of his Complaint, Plaintiff alleges that this section includes, "[s]pecific overt acts of retaliatory actions against Plaintiff and Hebrew Israelite Nazarene (black) Messianic banner inmates." (Doc. 1, p. 27). In this section, Plaintiff alleges conduct by the following Defendants: Cusiluwsky, Moore, and Kim. Plaintiff also appears to allege a claim of retaliatory transfer in Part E of his Complaint.

In support of the claims asserted in this section, Plaintiff alleges: (1) Defendant Cusiluwsky threatened to have Plaintiff sent to the SHU lockup if Plaintiff continued to call Defendant Cusiluwsky a racist; (2) Defendant Cusiluwsky made Plaintiff complete the "New Religious Component" form when it was not necessary in retaliation for Plaintiff's efforts to freely practice his faith; (3)

Defendants Cusiluwsky and Moore denied Plaintiff's request for an outside rabbi in retaliation for Plaintiff's accusation of racism; (4) Defendant Cusiluwsky, Moore, and Kim denied Plaintiff provisions during the Feast of Tabernacles in retaliation for Plaintiff's efforts to expose their discriminatory acts; (5) Defendant Moore rubbed his thumb on the inside of all cups given to Plaintiff's religious group in retaliation for Plaintiff taunting Defendant Moore about eating pork; (6) Defendant Kim interrupted a religious service to tell Plaintiff and his group to "stop being so loud" in retaliation for Plaintiff exposing Defendant Kim's discriminatory conduct. (Doc. 1, pp. 27-30). In Part E of his Complaint, Plaintiff alleges that Defendants retaliated against Plaintiff for filing administrative remedy requests by transferring Plaintiff to FCI McKean.

In their Brief, Moving Defendants argue that the retaliatory transfer claim from Part E of the Complaint should be dismissed because there is no available *Bivens* remedy. (Doc. 26, p. 20). They do not address the other retaliation claims asserted by Plaintiff in Part D of the Complaint.

The United States Supreme Court has not recognized a *Bivens* remedy for any type of First Amendment claim. Other courts have similarly concluded that Free speech, free exercise of religion, and retaliation claims are meaningfully different from any previous *Bivens* case decided by the United States Supreme Court. *See e.g., Railey v. Ebbert*, No. 1:18-CV-716, 407 F. Supp.3d 510, 519-521 (M.D. Pa. 2019)

(finding that a federal inmate's First Amendment claim presents a new context under *Bivens*). Thus, the Court must consider whether any alternative remedies exist and whether special factors counsel against extending a *Bivens* remedy before deciding whether to extend such a remedy to this claim.

As a federal inmate, Plaintiff has other remedies than a *Bivens* claim to protect his rights. First, Plaintiff has access to the Bureau of Prison's internal remedy system to address his complaints about his transfer. *See* 28 C.F.R. § 542.10-542.19. The Supreme Court has noted that "when alternative methods of relief are available, a *Bivens* remedy usually is not. Thus the availability of an alternative remedial structure may, on its own, prevent courts from expanding *Bivens*." *Mack v. Yost*, 968 F.3d 311, 320 (3d Cir. 2020). However, even if this remedy were not available, special factors counsel hesitation in expanding *Bivens* into this new context the absence of affirmative action by congress.

Concern over separation of powers and judicial interference with the administration of prisons weighs heavily against extending a *Bivens* to Plaintiff's First Amendment retaliation claim. As noted by the United States District Court for the District of Columbia when evaluating a First Amendment claim of retaliatory transfer:

> BOP officials' decision to transfer an inmate to a more secure facility lies within their expertise as to what is required to keep a correctional facility orderly and safe. *See Bistrian v. Levi*, 912 F.3d 79, 96 (3d Cir. 2018) (holding that a special factor counseling restraint was that the

plaintiff's First Amendment retaliation claims were "grounded in administrative detention decisions"). Precisely because courts lack such expertise, Congress has gone so far as to limit courts' ability to review BOP security and facility designations. *See* 18 U.S.C. § 3621(b) ("Notwithstanding any other provision of law, a designation of a place of imprisonment under this subsection is not reviewable by any court."); *Brown v. Holder*, 770 F. Supp. 2d 363, 365 (D.D.C. 2011) (explaining that 18 U.S.C. § 3625 excludes from APA review "cases in which federal inmates are challenging their security classifications and facility designations"). Similarly, the Supreme Court has warned that a court considering whether a prisoner has a liberty interest in his placement in a particular prison unit "ought to afford appropriate deference and flexibility to ... officials trying to manage a volatile environment." *Sandin v. Conner*, 515 U.S. 472, 482 (1995) (collecting cases). Given the leeway owed to the political branches when it comes to prison administration, the Court is reluctant to insert into that sphere a new form of liability.

*Pinson v. U.S. Dep't of Justice*, 514 F.Supp.3d 232 (D. D.C. 2021); *See also Railey v. Ebbert*, 407 F. Supp.3d 519-521.

Accordingly, Plaintiff's First Amendment claims alleging retaliation and retaliatory transfer should be dismissed.

### E.   PLAINTIFF'S CLAIMS UNDER 42 U.S.C. §§ 1981, 1985, AND 1986

In Part E of his Complaint, Plaintiff explains:

This part in regards to FCI Allenwood Administrative Staff's (Warden, Assistant Warden, Warden's Secretary, 2A Unit Manager, Unit 2A Counsel, Captain Lieutenant, et al.); actions of deliberate indifferent and blatant disregard of Plaintiff and Hebrew Israelite Nazarene (black) Messianic banner inmates' of FCI Allenwood continuous complaints and pleas for help, prevention and protection from the racial and religious discrimination against Hebrew Israelite Nazarene (black) Messianic Banner inmates by the chaplains, though the chaplains of FCI Allenwood admitted further in Re of FCI Allenwood Administrative staff's discrimination and retaliation for seeking to

redress grievances and to cover up and conceal the action of their subordanent staff, obstructing justice and vindication of Plaintiff and Hebrew Israelite Nazarene (black) Messianic inmates who were discriminated against.

All administrators herein and after named Defendants and others who's identities are unknown to Plaintiff at this time, have acted either individually and/or in concert combination confederate civil conspiracy to depribe [sic] Plaintiff of Equal Protection of the law, Due Process, and failed to prevent the conspiracy of the chaplains to deprive Plaintiff and Hebrew Israelite Nazarene group of their civil rights.

(Doc. 1, pp. 30-31) (typographical errors in original). I construe this section as Plaintiff's claims under 42 U.S.C. § 1981 (equal rights under the law), 42 U.S.C. § 1985 (conspiracy to interfere with civil rights), and 42 U.S.C. § 1986 (action for neglect to prevent).

In support of these claims, Plaintiff alleges that Defendants Seagraves, Nicholas, Washington, Munchler, Ready, Kane, Pretezer, Spartan/Spaulding, and Cusiluwsky conspired to impede Plaintiff's ability to file a lawsuit and/or cover up their own misconduct by restricting Plaintiff's access to the administrative remedy process and eventually transferring Plaintiff to FCI McKean.

Moving Defendants do not directly address these claims in their Brief in Support. I now turn to an analysis of these claims under the three statutes cited by Plaintiff in support of his claims.

### 1.   Plaintiff's Claims Under 42 U.S.C. § 1981 Should be Dismissed

Section 1981(a) of Title 42 of the United States Code provides that:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

Section 1981(c) of the same Title states, "[t]he rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law."

The only Defendants named by Plaintiff in his Complaint were acting under *federal*, not state, law. Section 1981 does not protect against alleged discrimination under color of *federal* law. *Quiles v. U.S. Dep't of Defense,* 2009 WL 4810188, at *5 (M.D. Pa. Dec. 10, 2009) (finding that a claim under § 1981 asserted against federal actors should be dismissed) (*quoting Dotson v. Griesa,* 398 F.3d 156, 162 (2d Cir. 2005)).

### 2. **Plaintiff's Claims Under 42 U.S.C. § 1985(3) should be dismissed.**

Section 1985(3) of Title 42 of the United States Code provides that:

If two or more persons in any State of Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to

vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

"[T]o state a claim under 42 U.S.C. § 1985(3), a plaintiff must allege: (1) a conspiracy; (2) motivated by racial or class based animus designed to deprive, directly or indirectly, any person or class of persons to the equal protection of the laws; (3) an act in furtherance of the conspiracy; and (4) and injury to person or property or deprivation of any right or privilege of a citizen of the United States." *Lake v. Arnold*, 112 F.3d 682, 685 (3d Cir. 1997) (citing *United Bhd. of Carpenters and Joiners of Am. Local 610 v. Scott*, 463 U.S. 825, 828-29 (1983); *Griffin*, 403 U.S. at 102-03).

Plaintiff identifies himself as a "member of the Nazarene (Branches) Hebrew Israelite's B.O.P. recognized Messianic Religious Banner faith group." (Doc. 1, p. 3). Plaintiff also suggests in his Complaint that many (if not all) of the members of that group at FCI Allenwood are black or African American. (Doc. 1, p. 5) (describing the group as "Black" Hebrew Israelite, Nazarene Messianic banner). The Complaint suggests that Plaintiff is a prolific filer of administrative remedy requests,

and that some of the administrative remedies Plaintiff has filed concern

discrimination (either racial or against his religious group at FCI Allenwood).

However, Plaintiff does not allege that Defendants obstructed his access to the

administrative remedy process or transferred him because of racial or class-based

animus. Instead, Plaintiff alleges that: (1) he was "targeted" because Defendants

believed Plaintiff was "abusing the process of administrative remedies and all of

[Plaintiff's] grievances were repetitive and frivolous," (Doc. 1, p. 33); and (2)

Plaintiff alleges he was told that "if Plaintiff kept it up filing administrative remedies

he would end up getting himself shipped real far away," (Doc. 1, p. 42). These

allegations do not suggest that Defendants were motivated by any racial or class-

based animus. As such, I find that Plaintiff's claim under 42 U.S.C. § 1985(3) should

be dismissed.

### 3. Plaintiff's Claims Under 42 U.S.C. § 1986 Should be Dismissed

Section 1986 of Title 42 of the United States Code provides that:

> Every person who, having knowledge that any of the wrongs conspired
> to be done, and mentioned in section 1985 of this title, are about to be
> committed, and having power to prevent or aid in preventing the
> commission of the same, neglects or refuses so to do, if such wrongful
> act be committed, shall be liable to the party injured, or his legal
> representatives, for all damages caused by such wrongful act, which
> such person by reasonable diligence could have been prevented; and
> such damages may be recovered in an action on the case; and any
> number of persons guilty of such wrongful neglect or refusal may be
> joined as defendants in the action; and if the death of any party be
> caused by any such wrongful act and neglect, the legal representatives

of the deceased shall have such action therefor, and may recover not exceeding $5,000 damages therein, for the benefit of the window of the deceased, if there be one, and if there be no widow, then for the benefit of the next of kin of the deceased. But no action under the provisions of this section shall be sustained which is not commenced within one year after the cause of action has accrued.

Section 1986 creates a right of action for failure to prevent a wrong proscribed by § 1985. *See Rouse v. City of Pittsburgh*, No. 2018 WL 3209430 at *15 (W.D. Pa. Apr. 17, 2018). This means that to bring a plausible § 1986 claim, the Plaintiff must also have a plausible § 1985 claim. As discussed in Section IV. E. 2. of this Report, Plaintiff has failed to plead a plausible § 1985 claim. As such, Plaintiff's § 1986 claim should also be dismissed.

## F.   PLAINTIFF'S CLAIMS AGAINST THE BOP SHOULD BE DISMISSED

Plaintiff names the Federal Bureau of Prisons as the first Defendant ("Defendant BOP") on the first page of his Complaint. (Doc. 1, p. 1). However, it is not clear what claims Plaintiff is asserting against Defendant BOP. As explained in Section IV. C. 1. of this Report, dismissal under Rule 8 of the Federal Rules of Civil Procedure is appropriate when the Court cannot discern what, of the many things discussed, is a cause of action alleged. In the case here, Plaintiff alleges many instances of alleged misconduct by the individual Defendants, but does not explain what he believes Defendant BOP is responsible for, or why it is responsible.

Accordingly, I find that Plaintiff's claims against Defendant BOP should be dismissed.

## V.       RECOMMENDATION

Accordingly, it is RECOMMENDED that:

(1)     Plaintiff's entire Complaint be DISMISSED pursuant to Fed. R. Civ. P. 41(b), for the failure to abide by Court Orders; **or in the alternative**,

(2)     Moving Defendants' Motion to Dismiss/Motion for Summary Judgment (Doc. 25) be GRANTED in PART to the extent it is consistent with this REPORT.

Pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and Moving Defendants' Motion to Dismiss/Motion for Summary Judgment (Doc. 25), dismissal/judgment should be GRANTED as to all claims EXCEPT Plaintiff's RFRA claims related to the symbols in the Allenwood Chapel (*See* §IV.B.8, p. 41), his request to wear a purple head covering (*See* §IV.B.9, p. 42), and his objection to the specific PPD Tuberculosis test (*See* §IV.B.14, p. 49).

(3)     If the matter is not dismissed in its entirety for failure to prosecute and if Plaintiff's RFRA claims are permitted to proceed, the Court should refer this matter back to the undersigned to direct that Plaintiff's Complaint be properly served on Defendant Asp and for pretrial management on the remaining claims.


Date: October 8, 2021                          BY THE COURT

                                               *s/William I. Arbuckle*
                                               William I. Arbuckle
                                               U.S. Magistrate Judge

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DARNELL DOSS, | ) | CIVIL ACTION NO. 4:19-CV-1789 |
| Plaintiff | ) | |
| | ) | (RAMBO, D.J.) |
| v. | ) | |
| | ) | (ARBUCKLE, M.J.) |
| BUREAU OF PRISONS, *et al.,* | ) | |
| Defendants | ) | |

NOTICE OF LOCAL RULE 72.3

NOTICE IS HEREBY GIVEN that any party may obtain a review of the Report and Recommendation pursuant to Local Rule 72.3, which provides:

Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses, or recommit the matter to the magistrate judge with instructions.

Date: October 8, 2021                    BY THE COURT

*s/William I. Arbuckle*
William I. Arbuckle
U.S. Magistrate Judge